IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FEIT ELECTRIC COMPANY, INC.,      )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        1:15CV535
                                  )
CREE, INC.,                       )
                                  )
                Defendant.        )

### MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court is a Motion for Preliminary Injunction filed by Plaintiff Feit Electric Company, Inc. ("Plaintiff"). (Doc. 12.) Defendant Cree, Inc. ("Defendant") has responded, (Doc. 18), and Plaintiff has replied (Doc. 23.) This matter is now ripe for resolution, and for the reasons stated herein, Plaintiff's Motion for Preliminary Injunction will be denied.

I.    **BACKGROUND**

The relevant facts in this case are relatively straightforward. Plaintiff is a California-based company that is in the business of buying specially manufactured LED light bulbs and selling them to retailers. (Complaint ("Compl.") (Doc. 1) ¶¶ 2-3.) Defendant is a North Carolina based corporation that is in the business of developing and selling a

variety of lighting and semiconductor products. (Compl. (Doc. 1) ¶ 5; Answer (Doc. 17) ¶ 5.)

Plaintiff owns two relevant patents that cover LED light bulbs: U.S. Patent No. 8,408,748 ("the '748 patent"), which issued on April 2, 2013, and U.S. Patent No. 9,016,901 ("the '901 patent"), which issued on April 28, 2015. (See Compl. (Doc. 1) at ¶¶ 9-10.) Plaintiff acquired these patents on June 15, 2015. (See Declaration of Aaron Feit ("Feit Decl.") (Doc. 14) ¶ 12.) Plaintiff contends that Defendant began selling LED bulbs that infringe these patents in or about October, 2014. (See Pl.'s Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Br.") (Doc. 13) at 3.)[1] Plaintiff filed the instant action on July 7, 2015, alleging two counts of patent infringement, one as to each patent. (Id. at 4.) Plaintiff requests that a preliminary injunction issue that prevents Defendant from expanding the retailers and distributers to which it sells the allegedly infringing LED bulbs, but specifically notes that it does not request that Defendant be barred from selling the allegedly infringing bulbs to its current customers. (Id. at 2.)

---

[1]All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

## II. __ANALYSIS__

A plaintiff seeking a preliminary injunction must establish: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1049 (Fed. Cir. 2010). The court must weigh the factors against each other and against the form and magnitude of requested relief. Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1365 (Fed. Cir. 2002). Preliminary injunctions are extraordinary remedies involving the exercise of a very far-reaching power that should be granted only sparingly and in limited circumstances. Mylan Pharm., Inc. v. U.S. FDA, 23 F. Supp. 3d 631, 638-40 (N.D. W.Va. 2014)(rev'd on other grounds).

### A. __Likelihood of Success on the Merits__

To show a likelihood of success on the merits, a patent owner must show that success in establishing patent infringement is more likely than not in light of the presumptions and burdens at trial. Revision Military Inc. v. Balboa Mfg. Co., 700 F.3d 524, 525-26 (Fed. Cir. 2012). Thus, Plaintiff must show both that it will likely succeed on its infringement claim, and that

- 3 -

its patents will withstand Defendant's challenges to their validity. Id. If Plaintiff cannot show that any challenges to its patents' validity "lack[] substantial merit," then they have not shown a likelihood of success on the merits. Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1335 (Fed. Cir. 2006).

An infringement analysis involves two steps. The court must first construe the scope of the asserted claims, and then compare the accused product to the properly construed claims of the patent to determine whether each and every limitation of a claim is present, either literally or equivalently, in the accused product. Tate Access Floors, 279 F.3d at 1365.

Claim construction is a legal issue for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). Claim construction begins with the language of the claims, and a court must presume that the terms in the claim "mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meanings of claim terms." See Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). This presumption in favor of the ordinary meaning of the claim language can be overcome when either (1) the patentee has clearly and explicitly defined the claim term, or (2) the claim term would render the claim devoid of clarity such that there is no means by which the scope of the claim may be

- 4 -

ascertained from the language used.  Bell Atl. Network Servs.,

Inv. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1268 (Fed.

Cir. 2001).

In some cases, the ordinary meaning of claim language as

understood by a person of skill in the art may be readily

apparent even to lay judges, and claim construction in such

cases involves little more than the application of the widely

accepted meaning of commonly understood words. See Brown v. 3M,

265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the claims

did "not require elaborate interpretation"). In such

circumstances, general purpose dictionaries may be helpful.

However, because the meaning of a claim term as understood by

persons of skill in the art is often not immediately apparent,

and because patentees frequently use terms idiosyncratically,

the court looks to "those sources available to the public that

show what a person of skill in the art would have understood

disputed claim language to mean." Innova/Pure Water, Inc. v.

Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed.

Cir. 2004). Those sources include "the words of the claims

themselves, the remainder of the specification, the prosecution

history, and extrinsic evidence concerning relevant scientific

principles, the meaning of technical terms, and the state of the

art."  Id.

### 1.  Patent No. 8,408,748 (the '748 Patent)

Plaintiff claims first that Defendant's product, called a "4Flow" LED bulb, infringes Plaintiff's '748 patent because it meets every limitation of Claim 1 of that patent, as well as the limitations of dependent claims 2, 3, 4, 9, and 12.  (See Pl.'s Br. (Doc. 13) at 8-10.)  Claim 1, an independent claim, claims the following:

An LED lamp comprising:

a.   a base,

b.   an elevated light source, comprising

    i.   a first plurality of LEDs connected in series and mounted on one side of a generally flat substrate, said substrate being spaced from said base, and

    ii.  a second plurality of LEDs, equal in number to said first plurality of LEDs, connected in series and mounted on an opposite side of said generally flat substrate, said second plurality of LEDs being located on opposite sides of said generally flat substrate in exactly the same position with said first plurality of LEDs in a filament shape,

b.   a heat sink in said substrate, each LED of said first and second plurality of LEDs being mounted proximate said heat sink, and

c.   a drive circuit for said LEDs, said drive circuit being located proximate and electrically connected to said base.

(See Pl.'s Br., Ex. 2, '748 Patent (Doc. 13-2) at 23.)

Although Claim 1 is comprised of several limitations, as noted above, there appears to be only one that is actually in dispute as to infringement: Defendant contends that its product does not contain LEDs that are "in a filament shape" as claimed by the '748 patent and as such, its product does not infringe the patent. (See Def.'s Opp'n to Mot. for Prelim. Inj. ("Def.'s Resp.") (Doc. 18) at 8-12.)

Notably, Defendant's product dress advertises <u>expressly</u> that the bulbs at issue are in a "filament design" that both "looks and lights like a light bulb." (See Pl.'s Br., Ex. 4, '748 Patent Claim Chart (Doc. 13-4) at 5.)  In this court's opinion, this cuts against Defendant's current contention to the contrary.  This is especially so when taken in conjunction with the patent's prosecution history, wherein Plaintiff explains that the entire purpose of using a "filament shape or arrangement" is for the LED bulb to resemble the lighting of a traditional bulb. (See Pl.'s Br., Ex. 6, Patent Prosecution History (Doc. 13-6) at 5.)

Defendant also contends that the term filament shape as used in the patent should construed as limited to an arc shape, and that such a construction is supported by both the specification and the prosecution history.  (Def.'s Resp. (Doc.

- 7 -

18) at 10-11.) This court declines to read such a limitation into the claim on the current record.

First, Defendant ignores the fact that, while the specification does discuss a filament that is in an arc shape for the purposes of resembling what it refers to as a "classic filament shape," it does so in the context of describing a single embodiment, the best mode of the invention, and the specification does not state that the LEDs <u>must</u> be in the shape of an arc in <u>every</u> embodiment of the claimed invention. (<u>See</u> Pl.'s Br., Ex. 2, '748 Patent (Doc. 13-2) at 22.)

Even if the specification did contain such a written description, a court should not infer claim limitations from the written description. <u>See</u> <u>Resonate, Inc. v. Alteon Websystems, Inc.</u>, 338 F.3d 1360, 1364 (Fed. Cir. 2003). As the Federal Circuit explained in <u>Teleflex, Inc., v. Ficosa North America Corp.</u>, 299 F.3d 1313 (Fed. Cir. 2002), there is a "heavy presumption" that a claim term takes on its ordinary and accustomed meaning. <u>Id.</u> at 1327. A court may import a claim limitation from the written description that differs from the ordinary meaning only when the patentee has demonstrated an "intent to deviate from the ordinary . . . meaning . . . by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of <u>manifest</u>

- 8 -

exclusion or restriction, representing a clear disavowal of claim scope." Id. (emphasis added). Here, Defendant has pointed to no such clear disavowal, and this court finds none in the '748 patent.

The prosecution history also provides no support for the proposition that the term "filament shape" should be limited to the shape of an arc. Plaintiff's response to the Patent Office explains that the patent amendment clarifies that the LEDs are placed in "exactly the same relative location on opposite sides of the flat substrate," in a filament shape or arrangement. (See Pl.'s Br., Ex. 6 (Doc. 13-6) at 5 (emphasis added).) The response explains that this arrangement gives the impression of transparency similar to an incandescent bulb, and that this differs from prior art. (Id.) There is no discussion of an arc shape in the response.

Finally, as Plaintiff points out, to read the term "filament shape" in Claim 1 to be limited only to an arc shape would render Claim 10, which specifically claims an embodiment of Claim 1 where the LEDs are oriented "generally in an arc," superfluous. (Pl.'s Br. (Doc. 13) at 8-9.) "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Phillips v. AWH Corp., 415 F.3d

1303, 1315 (Fed. Cir. 2005); see also Trebro Mfg., Inc. v.
Firefly Equip., LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014)
(holding that reading a limitation from a dependent claim into
an independent claim would improperly render the dependent claim
redundant.)

Plaintiff contends that Defendant's product infringes
because it contains LEDs that are in the shape of C-6 and C-9
filaments.




Plaintiff contends that the LEDs on the main circuit board,
shown above, are in the shape of a C-6 filament. (See Pl.'s Br.,
Ex. 4 (Doc. 13-4) at 5.)

 

C-9
Wreath / Ring

Plaintiff also contends that the LEDs on the main and daughter circuit board, shown above, are in the shape of a C-9 ring filament. (Id.)

This court finds that Defendant's arguments to limit the scope of the '748 patent are inadequate on the current record. However, while there is some logic to Plaintiff's arguments in favor of infringement, on this limited record, the court is not able to interpret the meaning of the term "filament shape" as one skilled in the art, and as such, cannot find that Plaintiff has met its burden of showing that Defendant's product infringes the '748 patent.

- 11 -

## 2. Patent No. 9,016,901 (the '901 Patent)

Plaintiff also claims that Defendant's product infringes on the '901 patent, a continuation of the '748 patent, because it meets every limitation of Claim 16 of that patent. (See Pl.'s Br. (Doc. 13) at 10.)  Claim 16 reads:

An LED lamp comprising:

a base;

an elevated light source, comprising

> i.  a first plurality of LEDs connected in series and mounted on one side of a generally flat substrate, said substrate being spaced from said base, and being oriented perpendicular to a line extending from said base
>
> ii.  a second plurality of LEDs, equal in number to said first plurality of LEDs, connected in series and mounted on an opposite side of said generally flat substrate, said second plurality of LEDs being located on said opposite side of said generally flat substrate generally in alignment with said first plurality of LEDs;

a heat sink in said substrate, each LED of said first and second plurality of LEDs being mounted proximate said heat sink; and

a drive circuit for said LEDs, said drive circuit being located proximate and electrically connected to said base.

(See id., Ex. 3, '901 Patent (Doc. 13-3) at 25.)

The dispute surrounding this claim is over the phrase "being oriented perpendicular to a line extending from said

- 12 -

base" and whether it is the plurality of LEDs or the substrate that must be perpendicular to a line extending from the base.

Defendant contends that the phrase at issue relates to the substrate, and points to both expert testimony and the patent specification in support.

Defendant argues that Claim 16 should be read as requiring the substrate to be perpendicular to a line extending from the base, because the '901 patent specification explains that one embodiment of the invention includes the substrate being oriented perpendicular to the base, and another embodiment includes the substrate being oriented parallel to the base. (See Def.'s Resp. (Doc. 18) at 12; Pl.'s Br., Ex. 3, '901 Patent (Doc. 13-3) at 21.) Further, Defendant points out that Claims 11 and 12 of the '901 patent recite express embodiments of the invention with the substrate being oriented parallel and perpendicular to the base. (See Def.'s Resp. (Doc. 18) at 13; Pl.'s Br., Ex. 3, '901 Patent (Doc. 13-3) at 24.) Defendant's argument is perplexing, since taking these two points into consideration together militates against their preferred interpretation of the claim limitation. Claim 11 would directly conflict with Claim 1 if read in Defendant's preferred way, and further, when comparing the language of Claim 16, which is an independent claim, to the language of Claim 1, the independent

- 13 -

claim upon which claims 11 and 12 depend, it is impossible to read Claim 16 in a way that requires the substrate, rather than the LEDs, to be perpendicular to the base without rendering claim 12 entirely superfluous.

Further, the only difference between claims 1 and 16 in the '901 patent is addition of the language "and being oriented perpendicular to a line extending from said base." Although the claim could perhaps be phrased more clearly, under a plain reading of the claim, the phrase at issue appears to modify the phrase "a first plurality of LEDs." To read this phrase as relating to the substrate and not to the LEDs would render the second comma in the limitation superfluous. As such, Plaintiff has shown, at least at this stage, some likelihood of success as to infringement of the '901 patent.[2]

### 3. Invalidity

Even if a patentee shows the likelihood of infringement, the accused infringer can defeat a finding of likelihood of success on the merits by raising a "substantial question as to the validity of the patent in suit." Trebro, 748 F.3d at 1169.

---

[2] This court notes that all of these findings are made at this preliminary stage without the benefit of claim construction or a full record. As such, these findings do not establish the law of the case nor are they preclusive of a later, contrary finding.

However, patents are to be presumed valid unless proven otherwise. 35 U.S.C. § 282. As such, the burden is on Defendant to first show invalidity.

Defendant argues that: (1) if Plaintiff's construction of the term "filament shape" is accepted, it will render the claim indefinite, and thus invalid; and (2) the claims of the '748 patent are invalidated by prior art. (See Def.'s Resp. (Doc. 18) at 14.)

As to the first contention, this court agrees with Plaintiff that Defendant confuses indefiniteness with breadth. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1341 (Fed. Cir. 2005) ("[B]readth is not indefiniteness."). Although Defendant argues that the term "filament shape," if not limited to an arc shape, will encompass essentially "every shape possible." (See Declaration of Dr. Richard Shealy ("Shealy Decl.") (Doc. 19) at ¶¶ 82-83.) While it is true that there may well be a variety of different shapes included in the scope of such a claim (as illustrated by the variety of possible filament shapes put forth by Plaintiff), given the presumption of validity, this court cannot find on the current record that the term "filament shape" is indefinite such that it renders the patent invalid.

Defendant also contends that the '748 patent is invalid because it is anticipated by U.S. Patent No. 7,396,142 B2 (the "Laizure patent") and is rendered obvious by the Laizure patent in combination with U.S. Patent Application Publication 2004/0008525 A1 ("Shibata"). (See Def.'s Resp. (Doc. 18) at 14.)

A determination that a patent is invalid as being anticipated under 35 U.S.C. § 102 requires a finding that "each and every limitation is found either expressly or inherently in a single prior art reference." Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed. Cir. 1998). The burden of establishing invalidity is "especially difficult when . . . the infringer attempts to rely on prior art that was before the patent examiner during prosecution." Glaxo Grp. Ltd. V. Apotex, Inc., 376 F.3d 1339, 1348 (Fed. Cir. 2004).

Here, because the disclosure from the approved Laizure patent was before the Patent Examiner during prosecution, Defendant's burden is especially difficult in proving anticipation.[3] Plaintiff contends that the '748 patent's requirement that a plurality of LEDs be in "exactly the same position" on opposite sides of a substrate is a limitation that

---

[3] WO 2006/104553 was the publication before the Patent Examiner, but contains the exact same disclosure as the later approved Laizure patent. (See Pl.'s Reply (Doc. 23) at 5.)

is not disclosed in the Laizure patent, either explicitly or
inherently, and that thus Laizure does not anticipate the '748
patent. (See Pl.'s Reply (Doc. 23) at 5.)  Although there is no
explicit disclosure in Laizure of this limitation, Defendant
points to several diagrams in Laizure that it contends show LEDs
on either side of a substrate that are mounted "in the same
position or generally in alignment with the first plurality of
LEDs," and thus, Laizure implicitly anticipates this limitation.
(Def.'s Resp. (Doc. 18) at 14.)  The court notes, however, that
the implied limitation pointed out by Defendant in the Laizure
patent is not the same as the limitation contained in the '748
patent.  The '748 patent specification explains that the reason
the LED groups should be <u>exactly</u> opposite each other is to
create the impression of transparency by imitating a filament
shape. (See Pl.'s Br., Ex. 2, '748 Patent (Doc. 13-2) at 22.)
Laizure contains no discussion of transparency, or of where or
how the LEDs are required to be oriented. As such, this court
will not read such a specific limitation into a diagram without
more explanation.

Further, during prosecution, the Patent Examiner apparently
rejected the '748 patent on the basis of anticipation by U.S.
Patent No. 7,938,562 B2 (the "Ivey patent").  (See <u>id.</u>, Ex. 6,
'748 Patent Prosecution History Excerpts (Doc. 13-6) at 5.)

- 17 -

Ivey discloses the following figure that demonstrates LED placement:



FIG. 4

(See Pl.'s Br., Ex. 7, Ivey Patent (Doc. 13-7) at 14, Fig. 4.)

The '748 Patent was amended to add the language regarding placement of the LED groups exactly across from one another specifically to avoid anticipation by Ivey, and was granted by the patent office after this amendment. Defendant has failed to offer any argument regarding the disclosures in Laizure that would render those figures materially different from the ones in Ivey, and, given the high burden, has thus failed to show anticipation of the '748 patent on this basis.

Defendant also argues that Laizure anticipates the '901 patent. Plaintiff responds that the '901 patent is not

- 18 -

anticipated because the Laizure patent does not disclose the limitation that the LED groups are connected "in series." (See Pl.'s Reply (Doc. 23) at 6.) The '901 patent explains that LEDs are connected in a series in order to obtain a high voltage DC LED, the advantage of which is "the ability to add a smoothing capacitor to reduce current ripple and attain a steady light source with no flicker." (Pl.'s Br., Ex. 3, '901 Patent (Doc. 13-3) at 22.) Defendant points to no language in Laizure that expressly discusses such a series of LEDs or their purpose, but rather to diagrams that Defendant argues implicitly disclose LEDs in a series. (See Shealy Decl., Ex. B (Doc. 19-2) at 18 ("The LEDs are mounted on a generally flat substrate 18 and are connected in series as illustrated by the LEDs in a row.") (citing Laizure Figure 1).) Given the apparently technical nature of this limitation, as well as the fact that Laizure was before the Patent Office when it approved the '901 patent, Defendant has failed, at this stage of the proceedings, to meet its burden of demonstrating that the '901 patent is anticipated.

Finally, Defendant argues that the combination of Laizure and Shibata render the claims of the '748 patent obvious. However, even assuming, as Defendant claims, each claim limitation found in the '748 patent is present in the prior art, that alone is not enough to render the patent obvious. See

- 19 -

<u>Fromson v. Advance Offset Plate, Inc.</u>, 755 F.2d 1549, 1556 (Fed. Cir. 1985) (explaining that "[t]here is no basis in the law . . . for treating combinations of old elements differently in determining patentability"). "The critical inquiry is whether 'there is something in the prior art as a whole to <u>suggest</u> the desirability, and thus the obviousness, of making the combination.'" <u>Id.</u> (internal citations omitted). Here, Defendant provides no explanation or citation, either in the patents or to knowledge in the art at the time, to show why a person of ordinary skill in the art would have been motivated to combine Shibata and Laizure in a way that renders the '748 patent obvious.

As the '748 patent is to be presumed valid, Defendant must offer something more than conclusory statements from its expert to show clear and convincing evidence of obviousness. It has failed to meet that burden, and this court will not find the patents invalid on the current record.

### 4. <u>Irreparable Harm</u>

The inquiry into irreparable harm seeks to measure harms that "no damages payment, however great, could address." <u>Celsis in Vitro, Inc. v. CellzDirect, Inc.</u>, 664 F.3d 922, 930 (Fed. Cir. 2012). The simple fact that one could, if pressed, compute a money damages award does not always preclude a finding of

- 20 -

irreparable harm.  Id.  "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."  Sampson v. Murray, 415 U.S. 61, 90 (1974).  Contrary to Plaintiff's contention, a finding of infringement no longer creates a presumption of irreparable harm.  See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011) ("eBay jettisoned the presumption of irreparable harm" after a finding of infringement).  Further, the irreparable harm must be either currently present or imminent.  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 162 (2010) (emphasis added).

Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities all can be valid grounds for finding irreparable harm.  Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008); Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1382-83 (Fed. Cir. 2006); but see Martin v. Bimbo Foods Bakeries Distribution, Inc., No. 5:14-CV-17-BR, 2014 WL 2439954, at *6 (E.D.N.C. May 30, 2014) ("[G]oodwill can often be valued in monetary terms."). The burden is on the plaintiff to prove that irreparable harm will occur if these events take place, and the mere possibility that it may is not enough.

<u>Automated Merch. Sys., Inc. v. Crane Co.</u>, 357 F. App'x 297, 301

(Fed. Cir. 2009).[4]

A plaintiff must demonstrate more than the mere possibility

of irreparable harm, rather, the plaintiff must "demonstrate

that irreparable injury is <u>likely</u> in the absence of an

injunction."  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S.

---

[4] The court notes that Defendant alleges that in order to
show irreparable harm, Plaintiff is required to show a
"sufficiently strong causal nexus" between the alleged harm and
the alleged infringement. See <u>Apple Inc. v. Samsung Elecs. Co.</u>,
695 F.3d 1370, 1374 (Fed. Cir. 2012) ("Apple II"); <u>Apple Inc. v.
Samsung Elecs. Co.</u>, 809 F.3d 633, 639-640 (Fed. Cir. 2015). The
Federal Circuit has elaborated on this requirement in a series
of cases between Apple, Inc. and Samsung Electronics, Ltd. In
<u>Apple II</u>, the court explained that, when the accused product
includes many features of which only one (or a small minority)
infringe, the patentee must show that the harm it will suffer is
related to the actual infringement.  695 F.3d. at 1374. This is
because, as the court explained, "it may very well be that the
accused product would sell almost as well without incorporating
the patented feature.  And in that case, even if the competitive
injury that results from selling the accused device is
substantial, the harm that flows from the alleged infringement
(the only harm that should count) is not." <u>Id.</u> at 1374-75.
However, the Federal Circuit later noted that a patentee need
not show the patented feature is "the one and only reason for
consumer demand." <u>Apple Inc. v. Samsung Elecs. Co.</u>, 735 F.3d
1352, 1364 (Fed. Cir. 2013.)  Plaintiff contests this, arguing
that because it alleges infringement of the entire product
rather than a component part, it need not show a causal nexus.
While the Federal Circuit has recently held that causal nexus
must be shown regardless of whether an injunction is sought for
an entire product or merely a feature, <u>see Apple Inc.</u>, 809 F.3d
at 639-40, because the court finds that Plaintiff fails to show
a likelihood irreparable harm at all, it will not reach this
issue.

- 22 -

7, 22 (2008).  Here, Plaintiff alleges that it will be
irreparably harmed if an injunction is not issued due to the
loss of business relationships, the loss of the advantages
provided by greater sales volume, and the loss of customer
goodwill. (See Pl.'s Br. (Doc. 13) at 12-18.)  This court first
notes that Plaintiff does not actually sell the product
contained in the '748 or '901 patents, nor does Defendant
currently sell its allegedly infringing product to any of
Plaintiff's customers.  Rather, Plaintiff's complaint is that it
"believes [Defendant] is attempting to expand the retailers and
distributors to which it sells [its infringing product]" and
that "if retailers and distributors begin to buy [Defendant's
infringing product], it is likely that those retailers and
distributors will also buy other of [Defendant's products.]"
(See Feit Decl. (Doc. 14) ¶ 11 (emphasis added).)

     Simply put, the alleged harm is tenuous at best, and
entirely hypothetical, both in whether it will actually occur
and, if it does occur, whether it would be related in any way to

the infringement of the patents at issue.[5]  Plaintiff's theory of

harm is essentially a double hypothetical, and one that

Plaintiff has provided little evidence for.

Further, given the alleged possible harms, it appears that

money damages will be both calculable and available if Plaintiff

prevails. Plaintiff has not shown any evidence that any of these

alleged harms are imminent, much less likely, and Plaintiff has

thus failed to meet its burden of showing irreparable harm.

### 5.  **Balance of Equities**

Next in the analysis, the court must balance the harm that

will occur to the moving party from the denial of the injunction

with the harm that the nonmoving party will incur if the

injunction is granted.  Hybritech Inc. v. Abbott Labs., 849 F.2d

1446, 1457 (Fed. Cir. 1988).  An injunction should not be

granted if the impact on the nonmoving party would be more

---

[5] Plaintiff contends that even a threatened loss of customer
goodwill supports a finding of irreparable harm. Plaintiff's
cited cases for this proposition are distinguishable.  For
example, in Celsis, the plaintiff offered both uncontroverted
expert testimony about irreparable harm, as well as
substantiated its claims with "fact and expert testimony as well
as specific financial records." 664 F.3d at 930. Here, Plaintiff
has offered nothing of the sort. Several of Plaintiff's other
cases came down before eBay, and relied upon presumption of harm
that is no longer valid.  See, e.g., Bio-Technology Gen. Corp.
v. Genentech, Inc., 80 F.3d 1553, 1566 (Fed. Cir. 1996); Sanofi-
Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir.
2006).

harmful than the injury the moving party will suffer if the injunction is not granted. Litton Systems, Inc. v. Sundstrand Corp., 750 F.2d 952, 959 (Fed. Cir. 1984). Important considerations in weighing the balance of hardship include, but are not limited to, whether the hardship to the alleged infringer would be merely temporary in duration, and whether the infringer had yet entered the market. Ortho Pharm. Corp. v. Smith, CIV. A. No. 90-0242, 1990 WL 18681 (E.D. Pa. Feb. 23, 1990).

As stated above, Plaintiff has failed to provide any evidence that the harms it will suffer absent an injunction are anything more than conjecture. Plaintiff alternatively contends that the equities tip in its favor because Defendant will suffer little harm from the injunction it requests because it seeks merely to preserve the current status quo. (See Pl.'s Reply (Doc. 23) at 9-10.) However, Plaintiff's requested relief would not preserve the status quo so much as it would simply freeze Defendant's ability to expand its market presence. In contrast, the status quo prior to this suit being brought was one of free market competition, where Defendant was free to expand its customer base and maneuver in the market at will.

Although the injunction Plaintiff seeks is limited, the harm to Defendant in preventing it from operating normally or

taking advantage of possible business opportunities is still

greater than the entirely hypothetical harm alleged by

Plaintiff, and as such, the balance of equities tips in

Defendants favor.

### 6. **Public Interest**

"[T]he public is best served by enforcing patents that are

likely valid and infringed." Abbot Labs., 452 F.3d at 1348. The

focus of the district court's public interest analysis should be

whether there exists some critical public interest that would be

injured by the grant of preliminary relief. See Hybritech, 849

F.2d at 1458. The public's interest in enforcing patent rights

must also be weighed with other aspects of the public interest.

ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d

1312, 1341 (Fed. Cir. 2012).

Here, as the court must at this stage presume patents are

valid, there is at least some public interest in enforcing them.

However, Plaintiff does not practice these patents, and the

public has an interest in access to innovative products in the

marketplace. See Celgard, LLC v. LG Chem, Ltd., 624 F. App'x

748 (Fed. Cir. 2015). Further, the public benefits from the

lower prices that result from free market competition. Cannon,

Inc. v. GCC Int'l Ltd., No. 2006-1615, 2008 WL 213883 (Fed. Cir.

2008). Given the competing public interests at stake, the court finds that this factor favors neither side.

In sum, Plaintiff has failed to show that three of the four factors to be considered weigh in favor of a preliminary injunction. Most notably, Plaintiff has failed to sufficiently show that irreparable harm is either imminent or likely. A preliminary injunction, regardless of its scope, is an extraordinary remedy, and not one to be granted lightly. Accordingly, this court declines to enter a preliminary injunction, regardless of its findings on the likelihood of success on the merits.

## III. **CONCLUSION**

For the reasons stated herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 12) is **DENIED.**

This the 14th day of March, 2016.

_____
United States District Judge

Case 1:15-cv-00535-WO-JEP   Document 37   Filed 03/14/16   Page 27 of 27